**Original filed 5/17/06**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RANDY MOUTON, | ) | No. C 03-5691 JF (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION |
| | ) | FOR WRIT OF HABEAS |
| vs. | ) | CORPUS |
| | ) | |
| D. L. RUNNELS, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## INTRODUCTION

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder, attempted murder, robbery and attempted robbery. Petitioner raises the following claims for habeas relief: (1) the trial court violated his Sixth and Fourteenth Amendment rights to trial by jury by overruling his objections to the prosecution's peremptory challenges of African-American jurors; (2) the trial court's admission of the preliminary hearing testimony of a crucial witness violated Petitioner's Sixth and Fourteenth Amendment rights to confrontation and cross-examination; (3) the prosecutor committed misconduct in violation of Petitioner's right to due process; (4) the trial court's refusal to dismiss a juror violated his Sixth and Fourteenth Amendment rights to trial by an impartial jury;(5) the trial court's use of CALJIC

No. 17.41.1 in instructing the jury deprived him of his Sixth and Fourteenth Amendment rights to trial by an impartial jury; (6) his sentence is excessive in violation of the Eighth Amendment's prohibition of cruel and unusual punishment; and (7) the trial court's instructions to the jury on the felony murder rule violated his Fifth, Sixth, and Fourteenth Amendment rights to due process and to have the jury determine every fact at issue in the case.  This Court ordered Respondent to show cause why the petition should not be granted.  Respondent filed an answer addressing the merits of the petition, and Petitioner filed a traverse.  After reviewing the papers and the relevant portions of the record, the Court concludes that Petitioner's claims are without merit and will deny the petition.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the relevant facts as follows:

> In January 1996, Enrique Rodriguez was almost 16 years old and lived in apartment 302 at 1900 26th Avenue in Oakland with his parents, a brother and a friend named Gilberto Gil.  On January 20, 1996, Rodriguez had accompanied Gil to the restaurant where Gil worked, Gil had cashed a check and the two had visited a friend.  When they returned to the apartment building, after dark, it was raining heavily.  Gil opened the front gate with his key and they climbed the stairs to a second door, which Gil also opened with a key.  A black male about 16 years old, whom Rodriguez had seen around the building a few times, left as Rodriguez and Gil entered.  Rodriguez subsequently identified the young man as Nakeyveyon Jones.
>
> As Rodriquez followed Gil up the next staircase, a group of about four young African-American men appeared from behind the stairs.[1]  They were all wearing dark colored jackets and pants and had their heads and faces partially covered with white cloth (except for one that was green or yellow), so that Rodriguez could see only their eyes, noses and cheeks.  They appeared to be 16 to 20 years old, skinny and about 5'6" to 5'8" tall, although some could have been taller or shorter.[2]
>
> One of the group pointed a short barreled rifle at Rodriguez and said, "Break yourselves, mother fuckers."  Rodriguez noticed the person he had seen leaving the building come back inside and stand by the door, "like he was scared or something."

---

[1]  Rodriguez had told the police there could have been five or six in the group but testified that four was his "best estimate."

[2]  Rodriguez had told the police at the time of the incident that the men in the group were between 5'6" and 5'11" and that the one with the gun was about 5'11".

Gil ran up the stairs and the man with the rifle chased him. The others grabbed Rodriguez, made him walk to the landing, searched him and took his wallet, which contained less than $40. They then told him to run, and Rodriguez ran to his apartment. As he reached the third floor, he heard three or four gunshots. He turned the corner to go to his apartment and saw the man with the rifle shooting Gil, who was lying on his stomach in front of the apartment door. Rodriguez saw the man fire four shots in rapid succession. The man turned, shot Rodriguez twice, in the left hand and right arm, then ran down the stairs. Rodriguez ran to the fire escape, watched the front door of the building until the police arrived and did not see anyone leave the building. About two minutes after a police officer arrived, the paramedics came and took Rodriguez to the hospital for treatment.

Rodriguez spoke to the police shortly after he arrived at the hospital, then again at about 3 a.m., and at his house about 10 days later. He initially told the police officer he did not recognize any of the men but that the one he had seen leaving the building might have lived in the building. At trial, Rodriguez testified that he knew co-defendant [Randy] Mouton from living in the building and that Mouton had been "a lot" shorter in January 1996. Rodriguez did not recognize Greene as living in the building.

Oakland Police Sergeant Thomas Swisher, who had retired by the time of trial, testified that he spoke with Rodriguez at about 2:30 a.m. on January 21. Rodriguez was in a lot of pain from his gunshot wounds. He told Swisher that he had looked out the fire escape door and had not seen the shooter leave the building, and that the shooter was about 5'8" tall. On January 31, Swisher showed Rodriguez photographs of Mouton, Greene and Jones. Rodriguez did not recognize Greene, said Mouton lived on the first floor of the building, and identified Jones as the person he saw leaving the building as he and Gil entered.

Transito Chavez, who lived in unit 110 on the first floor of the building, was outside smoking a cigarette about fifteen minutes before the shooting. It was not raining. Chavez was holding the door of the building open about a foot and he could see the whole lobby. He observed four young men, about 5'6" to 5'7" and 130 to 140 pounds, enter the lobby, then walk toward the stairs and go up. The group included Mouton, whom Chavez had seen around the building a number of times, and three others whom he had seen "once or twice" talking with Mouton. They were dressed in dark clothing. Chavez returned to his apartment and about fifteen minutes later heard seven shots, with a gap of one to three seconds between some of the shots. He then heard people running down from the second floor, followed by the sound of someone laughing and people gathering outside the apartment. About a week after the shooting, Chavez was interviewed by the police and identified a photograph of Mouton. He testified at trial that a photograph of Mouton showed one of the four people he had seen in the lobby and a photograph of Nakeyveyon Jones "could have been" one of the people. He did not recognize a photograph of Greene as one of the people.

Oakland Police Officer Cynthia Espinoza arrived at 1900 26th Avenue at about 11:21 p.m. on January 20, 1996. Two other officers were already at the front gate.

They banged on the gate until it was opened by Mouton. There were five or ten people in the lobby, who directed the police to the third floor. Espinoza found Gil lying on his stomach, unconscious, a little bit past unit 302. Rodriguez was standing, holding his arm where he had been shot. Espinoza took a brief statement from Rodriguez, who was then taken to the hospital by the paramedics.

Espinoza and other officers searched the hallway for evidence. Officer Jack Doolittle found eight expended .22 caliber casings in the hallway and near Gil's body, and two deformed bullet slugs under his body. He also observed two strike marks, one in the wall near the doorway to apartment 302 and the other closer to the fire escape, that appeared to have been made by bullets fired from the direction of the staircase. The strike marks appeared to be recent, but Doolittle had no way of knowing when they were made. Doolittle found a wallet in Gil's pocket containing $342.

Espinoza and Doolittle were both at the scene for about four and a half to five hours. Four African-American youths in their late teens attracted their attention because they "continually" came up and down the stairs, going in and out of unit 315, "trying to get as close to the scene as possible; never asking any questions but seemed to be very interested in what was going on." Espinoza testified that of the group, Mouton appeared the most interested. Doolittle had a gunshot residue test kit available, but did not test any of the four; he testified that the test would be worthless if the suspect's hands had been washed.

Espinoza spoke with the four in the lobby and they identified themselves as Eric Greene, Curtis Lofton, Randy Mouton and Nakeyveyon Jones. Greene provided identification showing his name and address in San Leandro, and gave his birthdate as May 11, 1975. He was wearing a blue shirt and black jeans and was 5'10" and 140 pounds. The other three did not provide identification. Lofton gave his address as 1900 26th Avenue, unit 102, and his date of birth as August 5, 1976. He was wearing a dark blue jacket, red plaid shirt and black pants and was about 5'10" and 155 pounds. Mouton also gave unit 102 as his address, and gave a birth date of December 19, 1979. He was wearing a blue and gray cap, black leather jacket, blue shirt, black jeans, and appeared to be about 5'4" and 120 pounds. Nakeyveyon Jones gave his address as 2107 89th Avenue. He was wearing a blue multi-colored shirt and light blue jeans. In response to Espinoza's question, all four denied knowing anything about the shooting, although one said something about having heard gunshots.

Doolittle testified that the apartment building had one main door and two fire escapes. One fire escape led to the sidewalk, with a folding ladder that could be released for descent to the sidewalk; the other led to the courtyard. The fire escapes had unrestricted access to the building. The apartment manager testified that the courtyard was surrounded by a 10-foot fence, with a gate leading to 26th Avenue that was supposed to be kept locked. Police officer Bernard Thurman, who was also investigating the scene just after the shooting, testified that the ladder on the fire escape to the courtyard was not extended.

The manager of the apartment building testified that in January 1996, 22 of the 41 units in the building were occupied. Transito Chavez lived in unit 110 on the first floor. Three African-American males between the ages of 15 and 25 years lived in the building, one, a "heavyset guy" about 250 to 300 pounds, in unit 111, and two in unit 102. The manager often saw the taller of these two in apartment 212, which was rented to Maria Watson.

Police officers who canvassed the building shortly after 11:30 p.m. on January 20 were able to contact people in 11 of the 38 apartments. These included Maria Watson, an approximately 20-year-old African-American in apartment 212, Dorothea Smith - Mouton's mother - an approximately 40-year-old African-American in apartment 102, and an African-American in apartment 314 who gave his name as Antoine Lofton and his birthdate as August 5, 1976. At trial, co-defendant [Curtis] Carroll's uncle testified that Carroll's father's name was Curtis Lofton and that Curtis Carroll's birthday was August 5, 1978. One of the officers, Bernard Thurman, noticed two or three young men going back and forth from the exterior of the building to apartment 102; at one point, one of the young men came from the direction of apartment 102 and put a bag into a dumpster. Thurman's subsequent search of the premises included the insides of the dumpsters.

Shawnique Peterson testified that on January 20, 1996, she was living in apartment 314 at 1900 26th Avenue with her two children. She had been "going out" with appellant Greene for about a year; he stayed with her two or three times a week and with his mother in San Leandro the rest of the time. Greene, Mouton and Carroll were close friends and spent "a lot" of time together. Carroll did not live at the building but Peterson saw him there every day. Mouton lived on the first floor of the building with his mother, Dorothea Smith.

Peterson had been in Mouton's apartment often and on one occasion before January 20 had seen two guns, one that looked like a rifle and one a "long gun" that looked like an "Army gun" or "machine gun." The latter had a "Banana Clip" that held "a lot" of bullets. The rifle was kept under a mattress and the other gun was kept wrapped in a sheet in a closet. The day Peterson saw the guns, she was in the apartment with the three appellants and Mouton and Carroll took the guns out. On December 31, 1995, Peterson was in her apartment with the three appellants and the three talked about celebrating New Year's by going to the roof of the building and shooting "the gun."[3]

On January 20, 1996, Peterson left the building around 5 or 6 p.m. to go to her mother's house. Before leaving, she went to Mouton's apartment and gave Greene a kiss goodbye. The three appellants were there, as well as a 14 or 15 year old with

_____

[3] Maria Munoz testified that on the afternoon of New Year's Day in 1996 she heard a shot and then saw a "black" young man in the doorway to the courtyard of the building shoot a rifle three or four times. She subsequently picked Mouton's photograph from a line-up and at trial identified Mouton as the shooter.

a "funny name" whom Peterson had not seen before. This teenager's name "might" have been Nakeyveyon.

Over the course of the evening, Peterson and Greene paged each other about every half hour, five or six times each. Greene's pages left Peterson's phone number except for the last page before Peterson returned to the building, which left Mouton's phone number. Peterson returned to the building at about 9:30 or 10 p.m. and saw police officers but not paramedics. Appellants and the teenager were in Peterson's apartment and remained there for about an hour, until Peterson got ready to go to bed. At that point, Mouton, Carroll and the teen-ager left and Greene stayed.

Peterson learned the next day that Greene had been arrested. Sometime after that, she was interviewed by the police at her house. The day following the interview, Mouton's brother Omar called her over to an apartment across the street, saying Carroll wanted to talk to her. Mouton had already been arrested by this time. Omar asked Peterson, "'what they say about "E,"'" and Peterson believed he was asking about Greene. She replied that "they was trying to pin him down for murder" and that this "wasn't right because he didn't do that." Peterson asked Carroll what had happened and Carroll said that he had shot the "Mexican guy." Peterson asked where the gun was and Carroll said he had it and was going to destroy or sell it and leave town.

Peterson acknowledged that when she first talked to the police she told them Greene was alone in her apartment when she returned on the night of January 20 and that this was not true. Her relationship with Greene continued for about a year after this incident and she testified that she "really like[d] him." She testified that she liked Carroll, too, and did not get angry with him.

Peterson testified that at the time of the shooting Mouton was about 16 years old, Carroll was about the same age or older, Green was a few years older, and the teen-ager appeared to be a year or two younger than Mouton and Carroll. Peterson had never seen Greene hold a gun. Peterson acknowledged she was on probation for a misdemeanor battery which occurred on February 26, 1997.

Dorothea Smith, Mouton's mother, testified that Mouton and Carroll had been close friends throughout their lives. On January 20, 1996, she lived in her apartment with her fiancé and Mouton; the apartment had one bedroom and Mouton sometimes slept there and sometimes slept on the couch. Omar Smith sometimes stayed with her but often stayed with girlfriends. On March 20, 1996, police officers searched the apartment and found a rifle under the couch. She had never seen the rifle before and had never seen ammunition in the house or in Mouton's possession. On the evening of January 20, she was in her apartment when she heard the shooting and Mouton was there as well. Asked whether she had told the police on March 20 that she and Mouton were not at the apartment building when the shooting took place, she testified that she did not remember what she had told them and said, "I probably was drinking."

On March 20, 1996, Detective Thomas Swisher conducted a search of the apartment

where Dorothea Smith and Mouton lived. Smith pointed to a couch in the front room as being where Mouton slept and to a closet where he kept his clothes. The police found a .22 rifle wedged between the springs and cushions of the couch, a shotgun shell on the floor behind the couch, and a bag under the couch containing a liquor box and a long sock that each contained .22 caliber ammunition. The liquor box held a 100-count box of "CCI .22 long rifle hallow point mini mag rounds," missing 15 or 16 rounds; the sock held five smaller boxes of "Thunderbolt brand .22 caliber ammunition." The police also found "CCI mini mag" .22 caliber rounds under the mattress in the bedroom, with some 83 missing from the 100-count container. In the closet, the police found seven 12-gauge shotgun shells. A .22 caliber casing was found on the floor in the front room. Dorothea Smith denied having any knowledge of weapons or ammunition in her home. In an interview about six hours after the search, Smith told Swisher that she, her boyfriend and Mouton had been out visiting her daughter on the evening of January 20, 1996, and that the shooting had already occurred by the time they returned to the building.

Lansing Lee, a criminalist with the Oakland Police Department, testified that the eight casings recovered from the homicide scene were .22 caliber, either "long" or "long rifle," manufactured by CCI. All eight were fired from the same firearm, which was not the rifle found in Mouton's apartment. The 12 casings recovered from the roof of the building were also CCI long or long rifle .22 caliber. Three of these 12 casings were fired from the same firearm that fired the ones at the homicide scene; six were fired by the firearm found in Mouton's apartment; and three were fired by a third firearm.

Mouton was arrested on March 20, 1996; Greene was arrested on March 21, 1996, and Carroll was arrested on April 9, 1996.

Criminalist Jennifer Hannaford testified that a fingerprint on the liquor box found in Mouton's apartment belonged to Carroll. A fingerprint on the underside of the lid of the cartridge box found in Mouton's apartment belonged to Mouton.

Swisher interviewed Nakeyveyon Jones on March 18, 1996, as a witness, because Jones had been seen leaving the building just before the shooting. Jones first denied knowing anything about the shooting and said he had never been at an apartment house at 26th and Foothill. After Swisher showed him a witness sheet from the crime report that listed his name and a photo lineup containing his photograph, Jones "remembered being at the scene the night of the shooting." Jones said he had been with appellants before the shooting and had left the building because he "didn't want any part of the robbery that had been planned." He said he had seen two Hispanics come into the building as he left. After the shots were fired, Mouton's mother let Jones back into the building and told him to go to the second floor, where the other young people were. He went back inside the building, after the shots were fired. Swisher characterized the interview of Jones as "low- keyed," with no yelling and no threats. Nakeyveyon Jones was not available to testify at trial and his preliminary hearing testimony was read into the record over appellants' objections. Jones testified that on the evening of January 20, 1996, he left his house with his friend Chris, Carroll, Omar Smith and "some females" in Chris' car. Chris drove to the

store and the girls got out and bought some chips.  The group then continued to Mouton's mother's apartment, where Mouton's mother let them in; Mouton was there.

At another point in his testimony, Jones said that Mouton had been with him, Carroll, and the girls when they first came to the building.  Jones testified that on the way into the building, some boys had given them some trouble and one had said he was going to shoot Jones.  He testified that he went to get Mouton, who came out with a rifle and then returned inside.

After about 10 minutes, Chris and Omar left.  Jones wanted to leave but Omar told him to stay.  Jones saw Mouton jump on top of the refrigerator and pull two rifles from behind it, look at them and put them back. Carroll and Mouton talked about having shot the gun "on New Year's."

Jones initially testified that he, Mouton and Carroll went upstairs to Greene's apartment and watched television for about 10 minutes, then Jones and Carroll returned to Mouton's apartment and continued talking with the girls, after which Greene and Mouton came back to the apartment and the girls left to go to the club "Faces."  At another point in his testimony, Jones stated that he remained downstairs while the girls were there and did not go upstairs with the others until after the girls left.  After the girls left, Jones and the three appellants went back to Greene's apartment and Mouton suggested going to a club called "Faces."[4]  Carroll suggested they rob someone and Mouton and Greene agreed; Jones did not want to and appellants called him names.  Mouton got a gun which he and Carroll told Jones was not loaded: Jones testified first that the group went back to Mouton's apartment and Mouton came out with a rifle that he "pointed around," then later testified that he remained upstairs in Greene's apartment when Mouton went downstairs and got the gun.  Appellants put on masks made from tee shirts.  Jones wanted to go home.  He testified initially that Carroll told him not to leave because "we had got into it with some boys downstairs," and later that he was scared to go outside because there were "some boys I had problems with down there that said they was going to shoot me."

In any event, Jones left.  He testified at one point that when he left Mouton was holding the gun and at another point that when he left Mouton had handed the gun to Carroll.  As Jones left the apartment building, he saw two Mexican men entering. Jones went to the corner, looking for a bus to go home, but there was not one coming.  A minute after seeing the men enter the building, he heard gunshots and ran back inside.  He went to Mouton's apartment and knocked but there was no answer, so he went upstairs to a girl's apartment he had previously been to with Carroll. An "old lady" opened the door and Jones saw appellants and a girl there.  Appellants were breathing fast and talking about the robbery. Carroll was rummaging through "the wallet."  Jones saw a piece of paper with Spanish words on it fall from the wallet.  Jones saw someone put the gun under the bed and appellants told Jones, "don't say nothing."  Jones was scared and called his mother and father to pick him

---

[4]  Jones had not met Greene before this evening.

up but neither was able to. Someone knocked on the door and Greene told Jones not to answer it and went into a closet. Jones testified that Greene's girlfriend came into the apartment after the shooting, although he indicated this occurred in Greene's apartment.

Later, Mouton went downstairs, followed by Jones and Carroll and then Greene. They were stopped by the police, who asked for their names. Carroll gave a fake name. Appellants went to the store, then returned to the building; Mouton and Greene went inside and Jones and Carroll left. On the way home, Carroll told Jones not to tell anyone anything and Jones was scared, thinking "probably he was going to shoot me." Subsequently, Jones saw Carroll when Carroll came to see Jones' cousin and Carroll told Jones, "I never thought I could pull a trigger like that."

Jones acknowledged that he had been arrested for driving a stolen car with a gun in it, and that he was on probation. He had also been found in possession of cocaine, although he claimed some other boys had "put it on [him]." Jones testified that when he was interviewed by the police a couple months after the shooting, he first lied because he was scared, then told the truth. Appellants did not testify.

Appellants were charged by an amended information filed on January 17, 1997, with the murder of Gilberto Medina Gil (Cal. Pen. Code § 187); attempted murder of Enrique Rodriguez (Cal. Penal Code §§ 187, 664); robbery of Enrique Rodriguez (Cal. Penal Code § 211) and attempted robbery of Gilberto Medina Gil (Cal. Penal Code §§ 211, 664). It was alleged that Carroll personally used a rifle (Cal. Penal Code §§ 1203.06, 12022.5) and that Greene and Mouton were armed with a rifle (Cal. Penal Code § 12022(d)) in the commission of the first three charged offenses; that Carroll personally inflicted great bodily injury (Cal. Penal Code § 1203.075) in the commission of the murder; and that Greene previously had been convicted of felony possession of narcotics. The prosecution subsequently dismissed the fourth count (attempted robbery) and the great bodily injury enhancement.

Jury trial was originally set for November 16, 1998, and, after continuances, began on March 29. 1999. On May 12, 1999, the jury found appellants guilty of first degree murder, attempted murder and first degree robbery. The jury found true the allegations that Carroll personally used a rifle in the commission of the offenses and found not true the allegations that Greene and Mouton were armed with a rifle during the commission of the offenses. Greene filed a motion for a new trial on June 29, 1999, in which Carroll joined on July 9; Mouton filed a motion for a new trial on July 12. These motions were denied on November 12, 1999.

On March 7, 2000, Mouton and Greene were each sentenced to a prison term of twenty-five years to life on count one, with concurrent upper terms of nine years on count two and six years on count three.

Respondent's Ex. C (Unpublished Opinion of the California Court of Appeal, First Appellate District, People v. Mouton, A090842, Jan. 31, 2002) at 2-13.

**DISCUSSION**

**A. Standard of Review**

This Court will entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court may not grant a petition with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-413 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

A federal court making the "unreasonable application" inquiry in a habeas case should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."

1   Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citation omitted).  This standard of review,

2   however, does not relieve a federal court of review from its duty to examine and analyze the

3   state court's application of federal law.

4
         A federal habeas court may grant the writ it if concludes that the state court's
5
    adjudication of the claim "resulted in a decision that was based on an unreasonable
6
    determination of the facts in light of the evidence presented in the State court proceeding." 28
7
8   U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made

9   by a state court unless the petitioner rebuts the presumption of correctness by clear and

10  convincing evidence. 28 U.S.C. §2254(e)(1).

11
    **B. Petitioner's Claims**
12
         (1) Wheeler/Batson Claims
13

14       Petitioner alleges that the trial court committed reversible error when it denied defense

15  motions for a mistrial pursuant to Batson v. Kentucky, 476 U.S. 79 (1986) and People v.

16  Wheeler, 22 Cal.3d 258 (1978).  Petitioner's Pet. for Review ("Petition") at 21.  At trial, the

17
    prosecution exercised a total of seventeen[5] peremptory challenges, eight of which were directed
18
    toward African-Americans.[6]  Ex. C at 14.  Petitioner claims that seven of these peremptory
19
20  challenges were made improperly on the basis of race.[7]  Id.

21

22       [5]  The prosecutor at trial claimed he had exercised eighteen challenges; the record reflects
23  seventeen.  Ex. C at 14, n. 9.

24       [6]  The prospective jurors excused were James B., Vera P., Abubakar B., Deborah N.,
    Getahun B., Shirley G., Carey M., Melba B., Jose Y., Cynthia I., John. J., Syreeta D., Claire N.,
25  Charles B., Cassandra V., and Artena P.  Although the appellate court states seventeen jurors
    were excused, the decision only lists the names of the above sixteen jurors.  Ex. C at 14, n.10.
26

27       [7]  Petitioner asserts that the prosecutor used sham excuses to remove *eight* African-
    American jurors.  Petition Attachment at 24 (emphasis added).  However, the appellate decision
28  held that Petitioner did not "challenge the removal of one of the eight African-American Jurors,
    Syreeta D.  At trial, appellant Greene tried unsuccessfully to have Syreeta D. removed for cause,

The final jury composition included two African-Americans.  Id.

Throughout jury selection, Petitioner moved for a mistrial several times, both by making a Wheeler motion and by arguing that the prosecutor was exercising peremptory challenges based on race.[8]  Ex. C at 14.  While it found that Petitioner failed to establish a prima facie case under Wheeler[9] because two African-Americans remained on the jury, the trial court required the prosecutor to explain his reasons for excusing the prospective African-American jurors.  Ex. C at 15.

A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair and impartial jury pool composed of a cross section of the community.  See Taylor v. Louisiana, 419 U.S. 522, 538 (1975); Duncan v. Louisiana, 391 U.S. 145, 148-58 (1968).  The Sixth Amendment's fair cross section requirement does not prevent either side from exercising its peremptory challenges in order to exclude cognizable groups from a jury that is impaneled.

---

arguing that she did not have 'a grasp of what's going on.'  The prosecutor excused her because she was 'not very bright' and the prosecutor was concerned about her ability to understand the case . . ." Ex. C at 14, n.11.  Accordingly, for purposes of the present analysis, Syreeta D's removal will not be discussed.

  [8]  After the prosecutor's sixth peremptory challenge, Petitioner moved for a mistrial under Wheeler, claiming three of the prospective jurors were excused because they were African-American.  Ex. C at 14.  The court denied the motion.  The Wheeler motion was made again after the ninth, thirteenth, fifteenth and seventeenth peremptory challenges.  Ex. C at 15.

  [9]  The United States Supreme Court held in Johnson v. California, 125 S. Ct. 2410 (2005), that the proper standard for judging whether a prima facie case had arisen was the Batson "inference" standard, not the California Wheeler state standard of "more likely than not." Johnson, 125 S. Ct. at 2416. However, a federal habeas court need not dwell on the first step of the Batson analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot."  Hernandez v. New York, 500 U.S. 352, 359 (1991); cf. Stubbs v. Gomez, 189 F.3d 1099, 1104 (9th Cir. 1999) (appellate court would not consider whether a prima facie showing had been made; question was mooted by habeas evidentiary hearing at which prosecutor first explained his peremptory challenges and district court found them to be race-neutral).

The Sixth Amendment requires only an impartial, not a representative, jury.  See Holland v. Illinois, 493 U.S. 474, 480.  There is no violation of the Sixth Amendment right to a jury composed of a fair cross section of the community, for example, when a prosecutor uses his peremptory challenges to exclude blacks.  See Batson, 476 U.S. at 84 n.4;  Weathersby v. Morris, 708 F.2d 1493, 1497 (9th Cir. 1983), cert. denied, 464 U.S. 1046 (1984).

Wheeler motions are made in California state courts in response to a pattern of peremptory challenges being used to strike potential jurors on the basis of race.  Wheeler, 22 Cal. 3d. at 276-77.  Batson, the federal counterpart of California's Wheeler decision, provides similar protections against group bias in the exercise of peremptory challenges.  Batson, 476 U.S. at 85-86.  African-Americans are a cognizable group under both Wheeler and Batson. People v. Catlin, 26 Cal. 4th 81, 116 (2001).  In order to prevail on a Wheeler/Batson motion, a party must "raise a timely objection and make a prima facie showing that one or more jurors has been excluded on the basis of group or racial identity." People v. Jenkins, 22 Cal. 4th 900, 993 (2000).  Batson holds that the moving party must "raise an inference" that a juror was excluded on an impermissible basis in order to make out this prima facie case.  If such a prima facie case is made, the burden shifts to the non-moving party to demonstrate genuine nondiscriminatory reasons for the challenge or challenges.  Id.  While challenges based on group bias are forbidden, "passivity, inattentiveness, or inability to relate to other jurors... [are] valid, race-neutral explanations for excluding jurors." United States v. Changco, 1 F.3d 837, 840 (9th Cir. 1993) (citations omitted).  Additionally, challenges based on attorney distrust of a juror's responses on a juror questionnaire or to direct question have been upheld as legitimate.  See Stubbs, 189 F.3d at 1105-07.

On appeal, Wheeler motions are reviewed "'with great restraint' [Citation.]," as the trial judge's determination is a factual one, and as long as "the trial court makes a 'sincere and

1    reasoned effort' to evaluate the nondiscriminatory justifications the prosecution offers, the

2    court's conclusions are entitled to deference on appeal if supported by substantial evidence."

3    People v. Ervin, 22 Cal.4th 48, 74-76 (2000).  The findings of the state appellate court only will

4    be disturbed on habeas review if they are "contrary to, or involved an unreasonable application

5    of, clearly established Federal law, as determined by the Supreme Court of the United States," 28

6    U.S.C. § 2254(d)(1), or "[were] based on an unreasonable determination of the facts in light of

7    the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

8

9        Respondent contends that the prosecutor exercised the peremptory challenges in good

10   faith by setting out race-neutral reasons for the seven peremptory challenges at issue and that the

11   challenges were not applied inconsistently to minority and non-minority jurors.  Resp. Mem. at

12   24.  Petitioner argues that the "rational [sic] offered by the prosecutor in this case for purging the

13   jury of African-Americans was not genuine; but rather a sham offered to provide cover for the

14   discriminatory use of peremptory challenges to substantially dilute representation of African-

15   Americans on this jury."  Petition Attachment at 27.  The state appellate court reviewed the

16   prosecutor's reasons for excusing the seven jurors and found that the prosecutor stated plausible,

17   non-discriminatory race-neutral reasons for striking the jurors in question.  Ex. C at 27.

18

19                 **A. Vera P.**

20       The prosecution excused Vera P. because she had "admitted that she [had] been

21   convicted of a moral turpitude crime . . . [of] credit card fraud.  She was in possession of a stolen

22   credit card."  Ex. C at 18.  The prosecution believed that Vera P.'s conviction of a crime of moral

23   turpitude rendered her unsuitable as a juror in a criminal case.  Additionally, the appellate court

24   noted that Petitioner did not argue Vera P.'s prior conviction was an invalid reason for the

25   prosecution's peremptory challenge.  Instead, Petitioner attacked the prosecutor's sincerity by

26   noting two Caucasian jurors were not challenged even though they had been arrested in the past.

27

28

Ex. C. at 19.

The appellate court rejected Petitioner's argument, stating:

> The California Supreme Court has repeatedly rejected "a procedure that places an
> "undue emphasis on comparisons of the stated reasons for the challenged excusals
> with similar characteristics of nonmembers of the group who were not challenged
> by the prosecutor," noting that such a comparison is one-sided and that it is not
> realistic to expect a trial judge to make such detailed comparisons midtrial.'
> (People v. Turner, supra, 8 Cal.4th 137, 169, quoting People v. Johnson, 47
> Cal.3d 1194, 1220-21 (1989)."  (citations omitted) . . . . Here, the comparison
> between Vera P.'s conviction of an offense related to use of a stolen credit card
> and the prior arrests of Trial Jurors Nos. 7 and 8 simply does not work.  Whatever
> the explanation Vera P. offered, she pled no contest to an offense involving moral
> turpitude.  Juror No. 7 had never been convicted of any offense but had been
> falsely arrested as a teenager . . . .Similarly, Trial Juror No. 8, an epileptic, had
> been arrested in the 1960's because the police thought he/she was drunk and
> disorderly . . [the prosecution believed] nothing in [their] experience might affect
> his/her ability to be fair and impartial.

Ex. C at 19-20.

The appellate court therefore concluded that the prosecutor stated plausible, non-
discriminatory reasons for excusing Vera P.

### B. Abubakar B.

The prosecution excused Abubakar B. for several reasons.  The first reason was that
Abubakar B. was a social director of an after school program for underprivileged children, a fact
which the prosecutor believed might cause him to "have a more forgiving attitude towards these
three defendants because the very nature he does work for, folks come from a similar
background as these three defendants."  Ex. C at 21.  Petitioner argues that the prosecutor's
comment reflects an improper reason for the peremptory challenge.  However, the state appellate
court found the prosecutor's belief that Abubakar B. might be more sympathetic towards
Petitioner because of his occupation was racially neutral.  The court noted that just because
Abubakar B. "stated he would not be influenced by sympathy based on [Petitioner's] age did not

preclude the prosecutor from drawing a different inference." Ex. C at 21.

Second, the prosecutor excused Abubakar B. because he was one of the jurors who laughed sarcastically when asked if he would believe the police officers' testimony and also because he failed to answer six questions on the juror questionnaire including "innocuous questions, about, for example, his kids and things of that nature." Ex. C at 21. Challenges based on attorney distrust of a juror's responses on a juror questionnaire or to direct question have been upheld as legitimate and race-neutral. Stubbs, 189 F.3d at 1105-07. The appellate court therefore concluded that Petitioner's claim as to Abubakar B. was without merit. Ex. C at 22.

### C. Getahun B.

Getahun B. indicated that Petitioner's age might affect his ability to reach a guilty verdict even if he believed Petitioner was guilty beyond a reasonable doubt. Petitioner contends this was an insufficient basis for the prosecutor's peremptory challenge of Getahun B., because Getahun B. "ultimately stated he would follow the law" despite the difficulty he might experience doing so because of Petitioner's age. Ex. C at 22.

The prosecutor stated adequate reasons for excusing Getahun B. "He [Getahun B.] was not sure whether he could [find Petitioner guilty due to his age] . . . I can't take that chance. I need someone who is going to say adamantly that is not an issue." Ex. C at 22. The appellate court concluded that the prosecutor's explanation was satisfactory and that the record provided no basis for Petitioner's argument that the exclusion of Getahun B was based on race.

### D.  Shirley G.

The prosecutor excused Shirley G. because her responses about her past experiences with the police, including having been falsely arrested and having witnessed a friend being beaten by police officers, suggested a "degree of anger and hostility." Ex. C at 23. Petitioner contends that although Shirley G. "readily admitted" her negative experiences with police officers, she did not

"express present hostility towards the police or unwillingness to follow the law." Ex. C at 23.

Additionally, Petitioner argues the prosecutor's challenge was inconsistent because Trial Juror

No. 7 and No. 8 were not excused despite their past false arrests and negative experiences with

the police. Ex. C at 23.

The state appellate court determined that the prosecutor's reason for excusing Shirley G.

was "inherently plausible and supported by the record." Ex. C at 24 (quoting <u>People v. Silva</u>, 25

Cal.4th 345, 386 (2001)). It noted that the prosecutor also had excused James B., a Caucasian

prospective juror who had a past negative experience with police officers and the prosecutor had

not challenged Trial Jurors No. 7 and No. 8 because both had affirmatively stated their prior

arrest experiences did not cause them to harbor any ill will towards the police and because they

believed they could be fair and impartial jurors. Ex. C at 23.

### E. Melba B.

The prosecutor excused Melba B. for two reasons. First, Melba B. was eighty years old

and had arthritis which she indicated in her questionnaire "might physically cause her to be

unable to sit as a juror." Ex. C at 24. The prosecutor felt that Melba B.'s arthritis "might cause

inconvenience and might interfere with the juror's concentration." Ex. C at 25. Petitioner

claims that the prosecutor's concern that Melba B's arthritis would inhibit her from walking up

and down the courthouse stairs was irrelevant because the courthouse had elevators and because

this did not impact her ability to perform as a "fair, impartial juror." Ex. C at 24. The appellate

court rejected Petitioner's argument stating "A concern that a juror might be uncomfortable, be

caused inconvenience or cause inconvenience to others in a lengthy trial is a race-neutral reason

for exercising a peremptory challenge and [the] trial court was entitled to accept it as genuine."

Ex. C at 25.

Second, the prosecutor asserted that ex-school teachers, like Melba B., tend to be liberal

and "forgiving of children," a reason supported by California case law.  Ex. C at 24; See People v. Barber, 200 Cal.App. 3d 378, 394 (1988).  Petitioner alleges that the prosecutor was inconsistent because he did not challenge Trial Juror No. 3. a school teacher, thus raising, as the appellate court acknowledged, "some question as to the legitimacy of the prosecutor's explanation in this case." Ex. C at 25.  However, the appellate court deferred to the trial court's finding that the prosecutor stated race-neutral reasons for excusing Melba B., noting the record on appeal "does not reflect what level of education Melba B. taught, or for how long, making it difficult to compare the likelihood of her being sympathetic toward [Petitioner] against the likelihood of such sympathy from Juror No. 3, who had only recently begun to work as a teacher's assistant with preschool-age children."  Id.

### F. Charles B.

The prosecutor excused Charles B. because he believed Charles B. was "a little bit off, a little bit weird" because when the clerk called his name "he approached and said 'that's Charles [B.] Senior, in kind of a cavalier way.  Not Charles [B.] Junior.'"  Ex. C at 25.  The prosecutor felt that Charles B.'s apparent attitude could cause conflict with the other jurors.  Id. Additionally, the prosecutor was "'greatly' concerned with Charles B.'s comment that his daughter had been 'falsely accused of driving while Black' and that this 'happens frequently in society,' which 'implied a bias against police.'"  Ex. C at 26.  The prosecutor noted that Charles B. had worked with the food stamp program which suggested a "more forgiving attitude of someone who might have been in a social or impoverished state."  Ex. C at 26.  Although the prosecutor acknowledged that Charles B. admitted he could be impartial, the prosecutor did not want to "take any chances."  Ex. C at 26.

Petitioner contends Charles B. was not "weird," because his comment that he was "Charles [B.] senior" not "junior" stemmed from the fact that Charles B. Junior, his son, was

sitting as a juror in one of the other courtrooms the same day.  Ex. C at 26.  Petitioner also

argued Charles B.'s prior experience as a juror and the fact his son had been a robbery victim

made him a good choice.  Id.  The appellate court rejected Petitioner's arguments:

> the prosecutor was entitled to act on his feeling [that Charles B. was weird] as
> long as it was not based on Charles B.'s race.  Moreover, this was not the only
> reason the prosecutor offered for excusing Charles B.  As indicated above, the
> prosecutor's impression that a person whose occupation involved the provision of
> social services might tend to be sympathetic to defendants from an impoverished
> background constitutes a race-neutral reason for a peremptory challenge. [People
> v. Trevino, 55 Cal. App. 4th 396, 411-12.] Moreover, although Charles B. stated
> he would judge the police officers' credibility the 'same way' as anyone else's, he
> acknowledged [some skepticism in his ability to do so] . . . .

Ex. C at 26.

### G. Artena P.

The prosecutor excused Artena P. for two reasons.  First, she had cerebral palsy, the

physical symptoms of which concerned the prosecutor because of the possible "distractions

caused by physical issues, as well inconvenience to everyone if Artena P. could not climb stairs

and the possibility of having to reconstitute the jury if Artena P. had to be excused during trial."

Ex. C at 27.  Additionally, the prosecutor expressed a desire for a juror who showed no

indication of wavering in her decision or who was induced to "sympathize with the defendants

due to their age."  Id.  Finally, the prosecutor believed Artena P. seemed too "timid and very soft

spoken."  Id.  Petitioner contends that the prosecutor's reason for excusing Artena P. because of

his belief she lacked "decision-making and managerial skills" was inconsistent with excusing

both Abubakar B. and Charles B., who appeared to possess such skills.  Ex. C at 27.

The state appellate court found that the prosecutor's concern regarding Artena P.'s

physical inability to sit for the trial was race-neutral and that the prosecutor stated "other valid

reasons for excusing Abubakar V. and Charles B. which were accepted by the trial court."  Ex. C

at 27.  Indeed, while challenges based on group bias are forbidden, "passivity, inattentiveness, or

1    inability to relate to other jurors... [are] valid, race-neutral explanations for excluding jurors."

2    See Changco, 1 F.3d at 840.

3
        Based on the foregoing reasons, the state appellate court concluded that the trial court
4
     properly denied Petitioner's Wheeler/Batson claims because Petitioner failed to prove that the
5
     prosecutor's reasons for the peremptory challenges were "either inherently implausible or
6
7    unsupported by the record." Ex. C at 27.  The trial court evaluated the prosecutor's proffered

8    reasons in light of  the totality of the circumstances in determining that Petitioner failed to meet

9    his burden of proving purposeful discrimination.  Mitleider v. Hall, 391 F.3d 1039, 1047 (9th
10
     Cir. 2004);  Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003), Batson, 476 U.S. at 98;  Wade v.
11
     Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).  The empaneled jury contained two African-
12
13   Americans.  Although this last fact is not conclusive evidence proving non-discrimination, "it is

14   an indication of good faith in exercising peremptories, and an appropriate factor for the trial

15   judge to consider in ruling on a Wheeler objection. [Citations.] People v. Turner, 8 Cal.4th at
16
     168." Ex. C at 27-28.
17
        Petitioner has failed to establish that the state appellate court's decision was contrary to
18
19   or an unreasonable application of federal law or that it was based on an unreasonable

20   determination of the facts in light of the evidence presented in the state court proceeding.

21   Accordingly, he is not entitled to relief on this claim.
22
            (2) The Trial Court's Admission of The Preliminary Hearing Testimony of a Crucial
23              Unavailable Witness:

24              A. Prior Testimony
25
        Petitioner next alleges that the trial court deprived him of his constitutional rights to
26
27   confrontation and cross-examination when it determined that Naykeyvon Jones ("Jones"), a

28   crucial prosecution witness, was unavailable and admitted Jones' preliminary hearing testimony

into evidence at trial.  Petition Attachment at 28.  Petitioner further contends that the prosecution failed to exercise reasonable diligence to ensure Jones' appearance at trial.  Id.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment.  See Pointer v. Texas, 380 U.S. 400, 403 (1965).  At the time the California Court of Appeal rendered its decision in this case, the governing standard was Ohio v. Roberts, 448 U.S. 56 (1980), which held that out-of-court testimonial statements may be admitted as long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness."  Id. at 66. However, Crawford v. Washington, 541 U.S. 36 (2004), decided after Petitioner filed the instant petition, overruled Roberts.  The Ninth Circuit has held that Crawford applies retroactively to collateral attacks.  See Bockting v. Bayer, 399 F.3d 1010, 1020 (9th Cir. 2005), cert. granted, Whorton v. Bockting, 2006 WL 1310697 at *1 (U.S. May 15, 2006).

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay."  See Crawford, 541 U.S. at 51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Crawford, 541 U.S. at 51 (citations and quotation marks omitted).  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  Id. at 50-51.  Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendant had a prior opportunity to cross-examine the witnesses.  Crawford, 541 U.S. at 59. The reliability of such statements, for Confrontation Clause purposes, depends solely upon these

1    two factors.  See Id. at 68.

2        Although the Supreme Court had not yet decided this issue, this Court will presume that

3    Crawford is retroactive on federal habeas review pursuant to Ninth Circuit authority.  See

4    Bockting v. Bayer, 399 F.3d 1010, 1020 (9th Cir. 2005), cert. granted, Whorton v. Bockting,

5    
6    2006 WL 1310697 at *1 (U.S. May 15, 2006).  Under Crawford, although Jones' prior testimony

7    was testimonial hearsay,[10] it was properly admitted pursuant to California Evidence Code § 1291

8    because Jones was unavailable and Petitioner had a prior opportunity to cross-examine Jones at

9    the preliminary hearing.  The admission of Jones' testimony comports with the Supreme Court's

10   decision in Crawford, 541 U.S. at 59, which held that prior testimony may be introduced at trial

11   without violating the Confrontation Clause provided that the witness is unavailable and where

12   the defendant had prior opportunity to cross-examine.

13   

14

15        Petitioner nonetheless argues that his constitutional right to cross-examination was

16   violated by using Jones' preliminary hearing testimony "because although they were able to

17   cross-examine Jones at a preliminary hearing, that hearing involved a lower standard of proof

18   and there was a 'presumption' that the witness would be available for trial and subject to the

19   jury's evaluation of his demeanor and credibility."  Ex. C at 36-37.  The appellate court rejected

20   Petitioner's argument stating:

21
22       This argument would suggest that preliminary hearing testimony can never be
         sufficient under Evidence Code section 1291 [which admits prior testimony if a
23       witness is unavailable has given prior testimony subject to cross-examination by
         defendant] . . . While preliminary hearing testimony might not be admissible
24       under Evidence Code section 1291 if the defense was precluded from conducting
         a full cross-examination . . [Petitioner] makes no claim that this was the case here.
25

26

27       ──────────────────

28       [10]  The Confrontation Clause applies to all testimonial hearsay, which "[w]hatever else
     the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a
     grand jury, or at a former trial; and to police interrogations."  Crawford, 541 U.S. at 68.

1
2
3

> Defense counsel - the same counsel now representing [Petitioner] here - cross-examined Jones about his prior offenses and statements to the police concerning those offenses, about the changes in his story to the police regarding the shooting, and about his conduct on the night of the shooting and inconsistencies in his account.

4   Ex. C at 37.

5
6   Moreover, on habeas review, this Court can grant relief only if the state court decision

7   was contrary to, or an unreasonable application of, clearly established United States Supreme

8   Court authority.  28 U.S.C. § 2254(d).  The Supreme Court has never held that a prior

9   opportunity to cross-examine must meet any particular standards - for example, that a defendant

10  have the same right and opportunity to cross-examine the witness at a preliminary hearing as at a

11  trial - as Petitioner contends here.  Even if Petitioner could establish that his opportunity to

12  cross-examine Jones at the preliminary hearing was not the same as it would have been at trial,

13  there is no "clearly established" Supreme Court authority that would support habeas relief.

14  Petitioner further argues that the admission of Jones' testimony denied him due process

15  because the testimony was "unreliable," Ex. C at 34, and "involuntary."  Ex. C at 37.  The

16  appellate court rejected both of these claims.  First, the appellate court acknowledged that while

17  a trial court must exclude witness testimony if a witness is incapable of understanding his duty to

18  tell the truth, it is also the duty of the aggrieved party to make a timely objection to the

19  testimony.  Ex. C at 36.  Petitioner failed to make such an objection, and the appellate court

20  found nothing in the record to support Petitioner's claim that Jones was incapable of

21  understanding his duty to tell the truth.  Although it noted that "the credibility of Jones'

22  statements would be open to great question, given his changes of story, his history of criminal

23  conduct and attempts to evade responsibility for it . . ." it also concluded that these observations

24  did not "bear on the fundamental question of his competence to testify."  Ex. C at 36.

25  The appellate court also rejected Petitioner's claim that Jones' testimony was involuntary

26
27
28

because he "completely changed his story during his police interview . . . the change occurr[ing] after a brief break in the police interview during which Jones was accompanied by one officer [Swisher] to get a drink of water." Ex. C. at 37. While Petitioner argued that he was denied due process because he did not have an chance to cross-examine Jones regarding the voluntariness of his statement, the appellate court rejected this argument, pointing out that "Jones himself was specifically questioned on this point [the voluntariness of his statement] at the preliminary hearing and testified that Swisher did not say anything [in an effort to coerce a statement from Jones] to him during the water break. [Petitioner] offer[s] no reason to suspect Jones' testimony would have been any different if he had been available for questioning at the hearing on the voluntariness of his statement." Ex. C at 38.

Since Jones' prior testimony fits within the "testimonial" exception of <u>Crawford</u> and was properly admitted despite Petitioner's belated arguments, the only remaining question is whether Jones was correctly deemed "unavailable" by the trial court.

\\\

### B. Witness Unavailability

Petitioner claims that the prosecution did not "exercise reasonable diligence because it did not begin its efforts to produce Jones as a witness at trial . . . [and] did not begin its efforts to locate Jones until the case was set for trial and failed to take steps to prevent Jones from absenting himself." Ex. C at 28. Testimony made during a preliminary hearing may be admitted at trial if the witness is "unavailable."  <u>See</u> <u>Terrovona v. Kincheloe</u>, 852 F.2d 424, 427 (9th Cir. 1988) (dead witness) (citations omitted); <u>Baker v. Morris</u>, 761 F.2d 1396 (9th Cir. 1985) (same). This requires that the prosecutor make a *good faith effort* to obtain the witness's presence. <u>See</u> <u>Barber v. Page</u>, 390 U.S. 719, 724-25 (1968) (emphasis added); <u>United States v. Olafson</u>, 213 F.3d 435, 441-42 (9th  Cir. 2000) (good faith effort demonstrated where border patrol agents

1   called witness, who had been inadvertently returned to Mexico, but witness refused to return to

2   testify); Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor made a good-faith

3   effort to locate witness where he subpoenaed witness, met with witness to discuss proposed

4   testimony after issuing subpoena, tried to call witness three times as trial date approached,

5   contacted witness's parole officer, had a bench warrant issued for witness's arrest, and assigned

6   a criminal investigator to locate witness).

7        Here, the appellate court found that at a hearing on April 14, 1999, the trial court

8   properly determined that the prosecution made reasonable efforts to secure Jones's presence at

9   trial. Ex. C at 30.  On three separate occasions, an inspector from the Alameda District

10   Attorney's Office attempted to serve Jones at his mother's house.  Id.  On February 23, 1999,

11   when Jones's mother told the inspector that Jones was homeless and "might be living out of a

12   large gray American car with grill damage," an all-points-bulletin was issued for Jones the same

13   day.  Id.  Additionally, the Department of Motor Vehicles was contacted for information about a

14   gray car, and a computerized listing was generated providing contacts throughout Alameda

15   County.  Ex. C at 31.  The inspector again met with Jones's mother, who the inspector believed

16   was not being totally cooperative, and asked her to contact Jones.  She said she would do so but

17   failed to make contact with Jones by the time the inspector spoke with her a week later.  Ex. C at

18   31.  On March 22, 1999, an attempt was made to contact Jones's father and a daily bulletin was

19   distributed to the Oakland Police Department and other law enforcement agencies.  Ex. C at 31.

20   On March 23, 1999, the inspector went to Jones's grandmother's house and spoke with Jones's

21   cousin.  The cousin indicated she had not seen Jones for a while and did not know where he

22   lived.  Ex. C at 31.  The inspector again spoke with Jones's mother on March 24, 1999.  She had

23   no information regarding Jones's whereabouts.  On April 1, 1999, a visit was made to an address

24   believed to be Jones's father although it was discovered he had moved from the address six

months before.  The inspector then determined Jones was "not in custody in Contra Costa, San

Mateo or Santa Clara counties.  His regular checks of the computer systems did not reveal any

arrests for Jones, and his contacts [the investigator's] with a number of hospitals revealed no

patients with Jones's name."  Ex. C at 32.

Petitioner maintains that the prosecution was "dilatory in that it made no efforts to secure

Jones's appearance at trial between the time of his preliminary hearing testimony on October 16,

1996, and Gadsey's [an Alameda County inspector] unsuccessful attempt to serve him with a

subpoena on December 22, 1998."  Ex. C at 32.  Petitioner contends that the search was not

"timely begun."  Ex. C at 32 (citing to People v. Cromer, 24 Cal.4th 889, 892 (2001) (a case in

which the prosecution lost contact with the witness after the preliminary hearing and did not

attempt to find her until months after the first trial date)).

The appellate court rejected this argument noting that "[h]ere, there is no evidence the

prosecution had reason to believe it would not be able to find Jones, or Jones would not be a

cooperative witness, until it discovered in December 1998 that its information about Jones's

address was no longer valid and learned from Jones's mother in January 1999 that Jones did not

want to testify."  Ex. C at 32.  Additionally, the appellate court rejected Petitioner's argument

that if "an all points bulletin had been issued sooner, Jones could have been held after the

February 5, 1999, disturbance at his mother's house in Hayward . . .[because] the Hayward

police would have responded more quickly on February 5 and would have taken Jones into

custody."  Ex. C at 33.  The appellate court found Petitioner's argument to be completely

speculative, as there was no evidence that an all-points-bulletin would have made the police

respond faster, that Jones would have still been at his mother's house when the police arrived or

that arresting Jones on February 5 would have ensured his presence at trial two months later.

Although the Penal Code permits material witnesses to be held in custody, such custody is

subject to review every ten days, and it was unlikely Jones could have been held for two months.

Ex C. at 33.  Based on the record, the appellate court's determination that the prosecution made a

"good faith effort" to obtain Jones' presence and that the trial court correctly concluded that

Jones was "unavailable" was not unreasonable.  See Barber, 390 U.S. at 724-25.

Because he has failed to establish that the trial court's decision was contrary to, or an

unreasonable application of federal law, or that it was based on an unreasonable determination of

the facts in light of the evidence presented in the state court proceeding, Petitioner is not entitled

to relief on this claim.

(3) Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct during closing argument in

violation of Petitioner's right to due process.  During closing argument, the prosecutor

improperly expressed his personal opinion of Petitioner's guilt when he said, "I'm confident . . .

these people are guilty beyond a reasonable doubt."  Petition Attachment at 35.  The prosecutor

told the jury that the defendants "fit a profile of some people who would commit robberies

together."  Id. at 36.  Finally, Petitioner claims that the prosecutor misled the jury on the legal

definition of reasonable doubt, and misstated the law concerning circumstantial evidence.  Id. at

36-37.

Respondent contends that this claim is not exhausted because Petitioner's petition for

review to the California Supreme Court on this issue is supported solely by California law.

Resp. Mem. at 34, n. 20.  However, this Court may deny a petition on the merits even if it is

unexhausted.  See 28 U.S.C. § 2254(b)(2).  Moreover, it appears that exhaustion would be futile

at this stage of the proceedings.  The California Supreme Court certainly would deny the claim

on procedural timeliness grounds because Petitioner failed to raise the claim on direct appeal.

See In re Clark, 5 Cal.4th 750 (1993).  For these reasons, the Court will address the merits of this

claim below.

Petitioner first claims the prosecutor committed misconduct when he told the jury, "I'm confident . . . these people are guilty beyond a reasonable doubt." Petition Attachment at 35. The appellate court noted it would be misconduct for a prosecutor to express a personal belief if there is a substantial danger that the comment led the jury to believe the determination was based on information outside of the trial record. Ex. C at 43, citing People v. Bain, 5 Cal.3d 839, 848 (1971). However, the appellate court pointed out that, following a defense motion for mistrial because of the prosecutor's comment, the prosecutor made a corrective clarification to the jury, and the trial court admonished the jury to disregard any personal opinions stated by the district attorney. Ex. C at 44. The appellate court held these actions were adequate to ensure that the jury did not misunderstand the prosecutor's comment. Id. at 45.

Petitioner next claims that the prosecutor committed misconduct by claiming the defendants "fit a profile of some people who might commit robberies together." Id. Although the defense again requested a mistrial based on this comment, the trial court denied the motion and the defense made no request for a curative instruction to the jury. Id. As a result of the defense's failure to request an admonition of the jury, the appellate court determined that petitioner waived the issue for appeal. Id. Assuming the issue was not waived, the appellate court nonetheless held that the comments did not suggest the racial bias argued by the defense, but rather suggested the defendants' friendship "suggested a level of trust that 'fit' the fact that the offenses here stemmed from a group robbery." Id. at 46.

Petitioner next claims that the prosecutor misstated the proper definition of "reasonable doubt." Petition Attachment at 36. At trial, the prosecutor stated that defense counsel misled the jury as to the applicable standard: "[Defense counsel] mentioned 'moral certainty.' That's not the law today. That's not the standard of proof . . . Ladies and gentlemen, reasonable doubt is a

shield for the innocent; it is not a loophole for the guilty." Id.  The appellate court noted that Petitioner's argument was not supported by case law and held that the prosecutor did not misstate the concept of reasonable doubt to the jury.  Ex. C at 46-47.

Finally, Petitioner claimed the prosecutor misstated the law of circumstantial evidence when he told the jury to consider any circumstantial evidence in the "totality of the circumstances," rather than consider each piece in isolation.  Petition Attachment at 36.  The appellate court again noted Petitioner's argument was unsupported by case law and held that the prosecutor's statement was consistent with the legal requirements for circumstantial evidence. Ex. C at 47.

To succeed on a claim of prosecutorial misconduct in habeas review, petitioner must show that the prosecutor's misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974).  Therefore, the proper focus is not on the conduct of the prosecutor, but whether the trial was fair.  Smith v. Phillips, 455 U.S. 209, 219 (1982).

Petitioner has failed to demonstrate that the prosecutor's allegedly improper comments denied him due process of law.  First, Petitioner fails to demonstrate how his right to due process was violated by the prosecutor's statement of opinion.  When a trial court issues a curative instruction, a reviewing court will presume that the jury followed the instruction and no due process violation has occurred.  See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987); Darden, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge).  Here, not only did the trial court give a curative instruction, but the prosecutor corrected his earlier misstatement. Further, Petitioner has not established any evidence to indicate that the jury did not follow the

trial court's curative instruction to disregard any personal opinions expressed by counsel.

Second, assuming that the issue is not waived, Petitioner has not demonstrated how the prosecutor's "profile" argument violated Petitioner's right to due process. Although Petitioner claims that the comments were an attempt by the prosecutor to appeal to racial bias on the part of the jury, the prosecutor made no reference to race. As the appellate court held, "[t]he gist of the remarks . . . was simply that the fact of appellants' friendship suggested a level of trust that 'fit' the fact that the offenses here stemmed from a group robbery." Ex. C at 46.

Petitioner has not demonstrated that the prosecutor's statement regarding the legal standard of reasonable doubt violated Petitioner's right to due process. As noted by the appellate court, Petitioner cites no case law in support of his contention. Further, the appellate court held that the prosecutor stated the correct legal standard. Ex. C at 46-47. Finally, Petitioner has not demonstrated that his right to due process was violated by the prosecutor's statement concerning the consideration of circumstantial evidence. Again, Petitioner cites no case law in support of his contention. The appellate court noted that the prosecutor's remarks were consistent with the jury instruction on the evaluation of circumstantial evidence. Ex. C at 47-48. Petitioner has not demonstrated that the jury was misled by the prosecutor's comments.

Petitioner fails to establish that the state appellate court's decision was contrary to, or an unreasonable application of federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1), (2).

(4) The Trial Court's Failure to Dismiss Juror No. 10

Petitioner next alleges that the trial court's failure to remove Juror No. 10 violated his Sixth and Fourteenth Amendment right to trial by a fair and impartial jury. Petition Attachment at 38. Following the testimony of Petitioner's mother, Dorothea Smith, Juror No. 10 heard her

say, "I did good." Ex. C at 39. Although Juror No. 10 believed that the comment was

innocuous, she brought it to the trial court's attention, and was the questioned by the court and

counsel. Id. Defense counsel moved to have Juror No. 10 removed as a precaution. Id. The

trial court denied the motion, admonished Juror No. 10 not to discuss the overheard comment

with her fellow jurors, and elicited the juror's promise that she would not consider the comment

during her deliberations. Id.

   The appellate court found no error in the trial court's decision to allow Juror No. 10 to

remain on the jury. Id. at 40. The court acknowledged that a juror's receipt of extrinsic

information "falls within the general category of 'juror misconduct'" and "gives rise to a

presumption of prejudice, because it poses the risk that one or more jurors may be influenced by

material that the defendant has had no opportunity to confront, cross-examine, or rebut." People

v. Nesler, 16 Cal.4th 561, 579 (1997). "The court's decision whether to discharge a juror under

section 1089 is reviewed for abuse of discretion. [Citations.] The juror's inability to perform

must appear as a 'demonstrable reality' and will not be presumed. [Citations.]" People v. Lucas,

12 Cal.4th 415, 489 (1995). The appellate court noted that Juror No. 10 did not attach great

significance to the comment, did not think that the comment would affect her deliberations, and

did not tell any members of the jury what she had heard. Ex. C at 40.

   "Due process means a jury capable and willing to decide the case solely on the evidence

before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the

effect of such occurrences when they happen. Such determinations may properly be made at a

hearing like that ordered in Remmer and held in this case." Smith v. Phillips, 455 U.S. 209, 217

(1982) (trial judge held a hearing to assess an allegation of juror misconduct.).

   Petitioner has not demonstrated that the trial court's allowing Juror No. 10 to remain on

the jury resulted in a "'substantial and injurious effect or influence in determining the jury's

verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (citation omitted).  Petitioner places great

emphasis on the precise wording used by Juror No. 10 when questioned by the court and counsel

during the hearing: "[Defense Counsel]: As a juror, you are judging credibility.  Is that going to

come into play. [sic]  Juror No. 10: *I don't think so*.  [Defense Counsel]: I have no further

questions, your honor."  Ex. C at 39 (emphasis added); Petition Attachment at 38.  However,

Petitioner fails to establish any facts indicating that Juror No. 10 failed to follow her assurance

not to consider the statement in deliberations, or to share the information with the other jurors.

Indeed, the appellate court recognized that defense counsel sought to remove Juror No. 10 not on

the basis of any "demonstrable reality" that Juror No. 10 was unable to perform,  Lucas, 12

Cal.4th at 489, but merely "as a precaution."  Ex. C at 39.  Further, defense counsel did not

attempt to secure a more forceful declaration from Juror No. 10 after she replied, "I don't think

so."  Id.  Petitioner fails to establish that the state appellate court's decision was contrary to, or

an unreasonable application of federal law, or that it was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.  28

U.S.C. § 2254(d)(1), (2).

(5) The Trial Court's Use of CALJIC No. 17.41.1

Petitioner contends that the trial court erroneously instructed the jury with CALJIC No.

17.41.1[11] because that instruction involved the trial court in the jury's deliberative process,

thereby depriving Petitioner of his constitutional right to trial by an impartial jury.  Petition

Attachment at 39.  Petitioner argues that providing CALJIC No. 17.41.1 to the jury amounts to a

---

[11]  CALJIC 17.41.1 provides: "The integrity of a trial requires that jurors, at all times
during their deliberations, conduct themselves as required by these instructions.  Accordingly,
should it occur that any juror refuses to deliberate or expresses and intention to disregard the law
or decide the case based on penalty or punishment, or any other improper bases, it is the
obligation of the other jurors to immediately advise the Court of the situation."

structural defect warranting automatic reversal due to the error.  Id.

Respondent correctly points out that CALJIC 17.41.1 was upheld in People v. Engleman, 28 Cal.4th 436 (2002), which held that the instruction "did not violate the defendant's Sixth Amendment right to a jury trial because the right does not require absolute secrecy for jury deliberation 'in the face of an allegation of juror misconduct . . .'"  Resp. Mem. at 43-44. Respondent also correctly observes that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

Although it did not undertake an independent analysis of CALJIC No. 17.41.1 while Engleman was pending before the California Supreme Court, the appellate court denied Petitioner's claim, concluding that "[i]n the present case, there is no indication CALJIC No. 17.41.1 had any effect on any juror, no indication any juror was refusing to follow the law, intending to decide the case on an improper basis or engaging in other misconduct.  There is no evidence of any prejudice to [Petitioner] from the giving of CALJIC No. 1741.1."  Ex. C at 52-53.

Even if instructing the jury with CALJIC No. 17.41.1 was erroneous, Petitioner is not entitled to federal habeas relief because he has not shown that instruction so infected the entire trial that the resulting conviction violates dues process.  See Estelle, 502 U.S. at 72.  The state

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

appellate court found that there was no reasonable likelihood that the jury applied the instruction in a way that violated the Constitution.  Id. at 72 & n.4.  There is no evidence the alleged error had a "substantial or injurious effect or influence in determining the jury's verdict"  Brecht, 507 U.S. at 637, nor is CALJIC 17.41.1 inconsistent with any Supreme Court precedent.  See Brewer v. Hall , 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas claims against CALJIC 17.41.1).

(6) Sentencing

Petitioner next claims that the imposition of a twenty-five years-to-life sentence based upon theories of aiding and abetting and felony-murder violated his Eighth and Fourteenth Amendment rights against cruel and unusual punishment.

Respondent contends that this claim is not exhausted because Petitioner's petition for review to the California Supreme Court on this issue is based upon California law only.  Resp. Mem. at 48.  However, as noted previously this Court may deny a petition on the merits even if it is unexhausted.  See 28 U.S.C. § 2254(b)(2).  As is the case with Petitioner's other unexhausted claims, it appears that exhaustion would be futile at this stage of the proceedings.  The California Supreme Court certainly would deny the claim on procedural timeliness grounds because Petitioner failed to raise the claim on direct appeal.  See In re Clark, 5 Cal.4th 750 (1993).  For these reasons, the Court will address the merits of this claim below.

The state appellate court affirmed Petitioner's sentence of twenty-five years-to-life in state prison.  The court acknowledged the California Supreme Court's criticisms of the felony-murder rule, but recognized that the felony-murder rule remains the law in California.  Ex. C at 60.  The appellate court found that Petitioner's case was easily distinguishable from People v. Dillon, 34 Cal.3d 441 (1983), the case upon which Petitioner relied in bringing his claim.  Petitioner was older than Dillon at the time of the offense, and the record did not indicate

Petitioner was especially immature or unsophisticated.  Ex. C at 61.  Petitioner planned and

participated in the armed robbery resulting in the murder; the murder did not appear to be

committed in a fit of panic, as in <u>Dillon</u>, but was committed after Petitioner's co-defendant

Carroll followed the victim while the victim fled the scene of the robbery, and Jones testified

that Petitioner handed Carroll a rifle just before the robbery.  <u>Id.</u>  Nor was Petitioner's sentence

greater than that of the other persons involved in the offense, and in fact it was shorter than that

of Carroll, who actually committed the murder.  <u>Id.</u> at 61-62.

Sentencing courts must be accorded wide latitude in their discretion as to punishment.

<u>Walker v. Endell</u>, 850 F.2d 470, 476 (9th Cir. 1987), <u>cert. denied</u>, 488 U.S. 926, and <u>cert. denied</u>,

488 U.S. 981 (1988) (citations omitted).  "The Eighth Amendment does not require strict

proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are

'grossly disproportionate' to the crime."[12]  <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991)

(Kennedy, J., concurring) (citations omitted).  Where it cannot be said, as a threshold matter, that

the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate

to engage in a comparative analysis of the sentence received by the defendant to those received

by other defendants for other crimes.  <u>See</u> <u>United States v. Harris</u>, 154 F.3d 1082, 1084 (9th Cir.

1998).

Petitioner has not satisfied his burden of showing that his sentence was "grossly

disproportionate" to the crime for which he was convicted.  <u>Harmelin</u>, 501 U.S. at 1001

(Kennedy, J., concurring) (citations omitted).  As noted above and as emphasized by

[12]  Because no majority opinion emerged in <u>Harmelin</u>, Justice Kennedy's view is
considered the holding of the Court.  <u>See</u> <u>United States v. Bland</u>, 961 F.2d 123, 128-29 (9th Cir.
1992), <u>cert. denied</u>, 506 U.S. 858 (1992); <u>see also</u> <u>United States v. Dubose</u>, 146 F.3d 1141, 1146-
47 (9th Cir. 1998) (after <u>Harmelin</u> Eighth Amendment forbids "at most" only sentences that are
"grossly disproportionate").

1
2
3
4
5
6

Respondent, the trial court received testimony indicating Petitioner supplied the murder weapon to the shooter.  Resp. Mem. at 48.  Accordingly, Petitioner fails to establish that the state appellate court's decision was contrary to, or an unreasonable application of federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1), (2).

7

    (7) <u>The Trial Court's Felony-Murder Jury Instructions</u>

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

    Finally, Petitioner contends that the trial court erred in giving the felony-murder jury instruction because the instruction did not require that the jury determine the killing was committed in furtherance of the underlying robbery.  Petition Attachment at 42.  Citing to <u>People v. Pulido</u>, 15 Cal.4th 713 (1997), Petitioner claims that he could be found guilty of murder only if the jury concluded "that the killing was committed in furtherance of [Petitioner and co-Defendants'] common design, and that the failure to so instruct [the jury] was prejudicial because the evidence would likely have led the jury to conclude the killing did not further the underlying robbery."  Ex. C at 48.  In response, Respondent argues that Petitioner misstates the applicable California law, that the jury instructions adequately informed the jury of the above theory and that Petitioner does not assert a direct federal constitutional violation or cite to any Supreme Court cases that would support a due process claim.  Resp. Mem. at 44, 46.  Assuming without deciding that the claim is cognizable on federal habeas corpus grounds, the Court concludes that Petitioner's argument is without merit.

24
25
26
27
28

    A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht</u>, 507 U.S. at 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  <u>Id.</u>

(citation omitted); see, e.g., Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding

Brecht error where "at the very least" the court could not "'say with fair assurance . . . that the

judgment was not substantially swayed by the [instructional] error.'") (citation omitted).  The

Brecht standard applies retroactively.  See, e.g., McKinney v. Rees, 993 F.2d 1378, 1385 (9th

Cir. 1993) (applying Brecht to pre-Brecht final judgment), cert. denied, 510 U.S. 1020 (1993).

> The California Court of Appeal addressed the merits of Petitioner's claim and applied the

correct standard.  In doing so, the appellate court noted that Petitioner was convicted of first

degree murder on a felony-murder theory which required that the jury conclude that the killing

occurred as a "direct causal result" of a felony.  Ex. C at 48.  The jury was instructed as follows:

> The unlawful killing of a human being, whether intentional, unintentional or
> accidental, which occurs as a *direct causal result of robbery* is murder of the first
> degree when the perpetrator had the specific intent to commit that crime.

> The specific intent to commit robbery and the commission or attempted commission of
> such crime must be proved beyond a reasonable doubt.

> For purposes of determining whether an unlawful killing has occurred during the
> commission or attempted commission of a robbery, the commission of the crime of
> robbery is not confined to a fixed place or a limited period of time.

> If a human being is killed by any one of several persons engaged in the commission or
> the attempted commission of the crime of robbery, all persons, who either directly and
> actively commit the act constituting that crime, or who with the knowledge of the
> unlawful purpose of the perpetrator of the crime and with the intent or purpose of
> committing, encouraging, or facilitating the commission of the offense, aid, promote,
> encourage, or instigate by act or advice its commission, are guilty of murder of the first
> degree, whether the killing is intentional, unintentional or accidental.

> In order to be guilty of murder, as an aider and abettor to a felony murder, the accused
> and the killer must have been jointly engaged in the commission of the robbery at the
> time the fatal wound was inflicted.  However, an aider and abettor may still be
> responsible for the commission of the underlying robbery based upon other principles of
> law which will be given to you.

Ex. C at 48-49 (emphasis added).

> Petitioner asserts that these instructions permitted the jurors to conclude that the killing

occurred as a "direct causal result" of a robbery rather than under the <u>Pulido</u> standard, which

permits a "non-killer to be convicted of felony murder only if the killing was committed by his

accomplice 'acting in furtherance of their common design.'" Petition Attachment at 43.

Petitioner maintains that the CALJIC felony-murder jury instructions erroneously follow a

second line of California cases which state "'a broader rule [of felony murder complicity,] under

which the killing need have no particular causal or logical relationship to the common scheme,

but applies to any killing committed while the accomplice and killer are jointly engaged in the

robbery.'" <u>Id</u>. at 43.

     The appellate court reviewed Petitioner's argument and concluded that the trial court

appropriately instructed the jury with the CALJIC felony-murder jury instructions.  The

appellate court distinguished <u>Pulido</u>, finding "[t]he criticism discussed in <u>Pulido</u> of the broad rule

of felony-murder liability was based on that rule encompassing situations in which one of the

accomplices acts impulsively and independently, so that there is no causal relationship between

the original plan and the killing." Ex. C at 51-52.

     The appellate court also held that liability would attach to Petitioner under either the

narrow or broad view of felony-murder accomplice liability:

> The evidence showed that Gil ran up the stairs as he and Rodriguez were accosted
> by [Petitioner and co-Defendants] at gunpoint; co-Defendant Carroll-who was
> found by the jury to have been the shooter-immediately followed Gil as the other
> [co-Defendants] proceeded to rob Rodriguez.  The jury was instructed that it
> could find [Petitioner and co-Defendants] guilty of felony-murder as aiders and
> abettors only if they and the killer were 'jointly engaged in the commission of the
> robbery at the time the fatal wound was inflicted.'. . . From the jury's
> determinations that Carroll was jointly engaged in the commission of the robbery
> when he shot Gil and that the shooting was a direct causal result of the robbery, it
> follows that the jury believed Carroll was acting in furtherance of the robbery
> when he shot Gil."

Ex. C at 51-52.

Petitioner has not shown the jury instruction "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.  As the appellate court pointed out, Petitioner could have been convicted under either standard of felony-murder accomplice liability.  Because this determination was not unreasonable, Petitioner has failed to show that any instructional error resulted in "actual prejudice."  <u>Id.</u>

### CONCLUSION

The Court concludes that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition is denied.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: _____5/16/06_____

_____
JEREMY FOGEL
United States District Judge

1

2

3

4   A copy of this order was mailed to the following:

5

6   Randy R.M. Mouton
    P-75130
7   CA State Prison - Corcoran
    P.O. Box 3466
8   Corcoran, CA  93212-3466

9

10  David H. Rose
    CA Attorney General's Office
11  455 Golden Gate Avenue
    Suite 11000
12  San Francisco, CA  94102-7004

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Denying Petition for Writ of Habeas Corpus
P:\pro-se\sj.jf\hc.03\Mouton691den                    40